UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MUKUNDA DEV MUKHERJEE,

          Petitioner,                   Case No. 04-50044
                                            Honorable Thomas L. Ludington

v.

UNITED STATES OF AMERICA,

          Respondent.
_____/

## OPINION AND ORDER REJECTING IN PART MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING PETITIONER'S MOTION TO VACATE

On October 23, 2006, Petitioner Mukunda Mukherjee was sentenced to 328 years in federal custody. Mukherjee, a physician, wrote a myriad of prescriptions for controlled substances — amounting to the equivalent of over 35,000 kilograms of marijuana[1] — at $45 a prescription. He delivered the scripts without evaluating the patients who received them.

Mukherjee's conviction and sentence were affirmed by the Sixth Circuit, and the Supreme Court then declined to issue a certificate of certiorari. The case is presently before the Court based upon Mukherjee's motion to vacate his sentence pursuant to 28 U.S.C. § 2255.

---

[1] For potential sentencing purposes, the government calculated the amount of controlled substances Mukherjee prescribed to government agents while under investigation (*see* Pet'r's Resp. to Mot. in Limine, Ex. 5, ECF No. 69):

*Schedule II*: Percocet 10 mg (25 pills); Endocet 10 mg (60 pills); Oxycodone 10 mg (60 pills); Oxycodone 5 mg (24 pills); OxyContin 10 mg (60 pills); OxyContin 20 mg (1,321 pills); OxyContin 40 mg (33,986 pills); OxyContin 80 mg (45,767 pills); Morphine Sulfate 30 mg (140 pills); Morphine Sulfate 60 mg (690 pills); Avinza 30 mg (140 pills); Avinza 60 mg (275 pills); Avinza 90 mg (6,492 pills); Avinza 120 mg (15 pills); Kadian 50 mg (130 pills); Kadian 60 mg (70 pills); Kadian 100 mg (14 pills); Dilaudid 4 mg (157 pills); Concerta 18 mg (30 pills); Concerta 36 mg (60 pills); Methylphenidate 5 mg (1 pill); Methylin 5 mg (510 pills); Methlyphenidate 20 mg (242 pills); Methylin 20 mg (1,110 pills); Methylin ER 20 mg (180 pills); Metadate ER 20 mg (121 pills); Amphetamine 20 mg (366 pills); Amphetamine 30 mg (210 pills); Adderall XR 10 mg (60 tabs). *Schedule III*: Hydrocodone products all strengths (246,702 pills); Codeine Products all strengths (24,138 pills); Butalbital Products all strengths (1,055 pills). *Schedule IV*: Benzodiazcpines (107,831 pills); Diet pills (12,140 pills); Pain medications (3,036 pills); Sleep aids (102 pills). *Schedule V*: Cough syrup all brands (2,052,453 ml); Lomotil and GEQ (288 pills).

Mukherjee argues, *inter alia*, that he was denied his Sixth Amendment right to effective assistance of counsel during plea negotiations. According to Mukherjee, one of his attorneys was constitutionally deficient because Mukherjee was not adequately advised that rejecting a plea offer could result in a sentence for life in prison.

The motion was referred to United States Magistrate Judge Charles E. Binder, who conducted two evidentiary hearings and directed supplemental briefing on various issues. Judge Binder then authored a report recommending Mukherjee's motion be granted in part and denied in part. Specifically, Judge Binder found that Mukherjee's third attorney provided ineffective assistance which violated Mukherjee's Sixth Amendment rights. The government filed objections to the portion of the report recommending Mukherjee's motion be granted. The case is now before this Court to consider Judge Binder's report along with the government's objections. Because Mukherjee received constitutionally sufficient representation from all three of his attorneys — two of which explicitly warned him that rejecting a plea offer and proceeding trial could lead to a sentence for life in prison — his motion to vacate his sentence will be denied.

# I

## A

"It was almost like a tsunami attack while, you know, I was least expecting it. I thought I was helping the poor people getting good healthcare, and all of a sudden our life turn upside down."[2] At an evidentiary hearing on July 19, 2011, Mukherjee described his life in the months after he was arrested for illegally distributing controlled substances. According to Mukherjee, the 2004 arrest was "totally unexpected." July 19, 2011 Hr'g Tr. 59, ECF No. 189.

---

[2] July 19, 2011 Hr'g Tr. 57

Although Mukherjee's arrest is not objectively surprising given his relevant conduct — which will be discussed at length — it is unusual given his personal history. Mukherjee was an accomplished, highly-educated man. Born in Calcutta, India on July 5, 1942, Mukherjee moved to England at the age of 17 to attend Durham University. In 1961, he was admitted to King's College – Durham University to study medicine.

Mukherjee went on to earn his medical degree, and in 1968, moved to the United States to continue his studies. He first interned at Boston Children's Hospital, and then received a fellowship in nutrition and food science at Massachusetts Institute of Technology. In 1981, Mukherjee was granted United States Citizenship, and he served eight years with the United States Air Force; two years in active duty and six with the reserve corps.

Throughout this time, Mukherjee maintained a prominent medical career. He was first licensed in New York, and then spent 35 years as a clinical professor of family practice, pediatrics, and nutrition. During that period, he spent one-third of his time teaching, one-third of his time conducting research, and one-third of his time seeing patients.

In 1999, Mukherjee moved to Flint, Michigan, where he developed a unique practice of medicine. Over time, and in many cases without conducting physical examinations of any kind, Mukherjee wrote thousands of scripts for medicine like Vicodine, Morphine, Oxycontin, Oxycodone, and Codeine cough syrup.

Jeffrey Madaj, a Police Officer with the City of Saginaw, testified during Mukherjee's trial. He became involved with Mukherjee's investigation in April 2004 after a confidential informant (CI) indicated that Mukherjee was prescribing controlled substances without medical examinations. On the stand, Madaj discussed his experience as an undercover officer in Mukherjee's waiting room. Madaj visited Mukherjee's office a total of six times, the first

occurring on April 2, 2004. Trial Tr. Vol. II, at 94, ECF No. 127. Madaj also visited Mukherjee's office on April 5, April 19, May 5, May 24, and June 21 of 2004.

During his testimony, Madaj described a typical visit to Mukherjee's office. Generally, several people were waiting to see Mukherjee when Madaj would arrive. *Id*. at 107. On average, Madaj spent four hours waiting to see the doctor, and once waited as many as six. *Id*. at 108. If a patient wished to shorten the wait, the receptionist could be "tipped." [3] *Id*. at 112. Just before he was admitted to Mukherjee's office, often with as many as three other individuals, sometimes Madaj's blood pressure was taken,[4] and his paperwork was prepared. *Id*. at 109. "This would mean that you're next in line to see Dr. Mukherjee." *Id*. He described one occasion where an intoxicated woman, breaking the mold, forced her way into Mukherjee's office because she was "tired of waiting." *Id*. at 114–15. Mukherjee asked the woman to leave, but not before he wrote her a prescription — in an amount to satisfy both the woman and her husband. *Id*. at 114.

Madaj also discussed Mukherjee's method once patients gained entry to his office. "You would have three, sometimes four patients at one time inside of Dr. Mukherjee's office." *Id*. at 111. There was an exam bed in the office, "piled with paperwork and boxes." *Id*. at 119. According to Madaj, patients "never" used the exam bed. *Id*.

Mukherjee would be there, behind his desk, often with his feet "right up on the desk." *Id*. at 120. Mukherjee dressed flamboyantly — in pink, light blue, fluorescent green or yellow — and often wore a fanny-pack. *Id*. at 120–21. For $45, Mukherjee would write prescriptions the patients could fill that day. *Id*. at 127–28. For an additional $45, Mukherjee would "predate" a

---

[3] Madaj testified that he did not tip the receptionist on his first visit, waited six hours, and still "didn't see the doctor that day." Trial Tr. Vol. II. At 112. Each time thereafter he tipped the receptionist $20 in order to expedite his appointment.

[4] Madaj testified that his blood pressure was taken on only two of his visits. Trial Tr. Vol. II, at 109.

script, or write a second prescription for the same medication to be filled 10–14 days later. *Id*. at 128. After that, patients would leave the office. Madaj testified that he never saw any patients pay for their visit with insurance of any kind. *Id*. at 130–31. Instead, "[t]he money always went to Dr. Mukherjee." *Id*. at 129. Madaj established that over the course of his visits he received multiple prescriptions from Mukherjee — without ever being examined — for Vicodin, time-release Morphine tablets (Kadian and Avinza), Morphine Sulfate, and Codeine cough syrup. *Id*. at 139–44.

Cari Guerrero is a Police Officer with Saginaw Township, and like Madaj, was one of Mukherjee's "patients." She also testified during Mukherjee's trial. Guerrero had contact with Mukherjee on May 24 and June 7, 2004. Trial Tr. Vol. V, at 6, ECF No. 130. For $45, and without ever examining her, Mukherjee wrote Guerrero prescriptions for Vicodin, Morphine, Codeine cough syrup, and Sonata.[5] *Id*. at 8–11. She also received Celebrex capsules, bottles of Zyprexa, and Zoloft. *Id*. at 13. In fact, Mukherjee wrote prescriptions for Guerrero that he encouraged her to share with Madaj (who Mukherjee believed was just another patient, not a police officer). *Id*. at 16. This is troubling, of course, as Mukherjee was prescribing medication for one patient and directing her to share it with another. Guerrero emphasized that throughout her visits, she was never examined by Mukherjee: "Physically there was – there was no contact whatsoever. There was just talking." *Id*. at 17.

On July 7, 2004, Mukherjee was indicted on one count of conspiracy to illegally distribute controlled substances and 53 counts of illegal distribution of controlled substances. Mukherjee retained William Brisbois to represent him, an attorney with over 30 years of criminal law experience. Brisbois was called as a witness during the evidentiary hearing Judge Binder

---

[5] Sonata is a brand name of Zaleplon, a sedative/hypnotic used almost entirely for the treatment of insomnia.

conducted on July 19, 2011. Brisbois testified that after he was retained, he discussed with Mukherjee "the charges in the indictment and the maximum penalties for those charges." July 19, 2011 Hr'g Tr. 6.

On September 15, 2004, Brisbois received a letter from Assistant United States Attorney (AUSA) Mark Jones regarding a plea offer. In the letter, Jones informed Brisbois that the government position regarding relevant conduct could result in a guidelines range for Mukherjee of 360 months to life. The letter read:

> The proposed plea agreement includes a base offense level of 28. The indictment lists a base offense level of 32 (creating a go-to-trial guideline range of 235 to 293 months, *i.e.*, 19.58 to 24.42 years). As we discussed on August 27, 2004, the government has a viable argument for a base offense level of 36 (creating a go-to-trial guideline range of 360 months to life). When I stated the government intended to supersede the indictment to include a level 36, you indicated that you would prefer that we wait to see if a negotiated settlement could be reached.

Pet'r's Reply Ex. 7, at 1, ECF No. 168.

Brisbois testified that after receiving the letter, he met with Mukherjee to "go through the proposed Rule 11 agreement with him." July 19, 2011 Hr'g Tr. 9. Brisbois testified as follows:

> Q: Did you also discuss with [Mukherjee] the maximum penalties that could be imposed if he were to reject the plea offer?
>
> A: Yes.
>
> Q: And in particular, did you warn him that those sentences when – if they were ordered to be served consecutively would amount to a functional equivalent of a life – term of life imprisonment?
>
> A: Yes.
>
> Q: Exceeding hundreds of years?
>
> A: Yes.

*Id*. at 10. According to Brisbois, after discussing the pros and cons, Mukherjee decided to reject the government's plea offer.

Subsequently, in December 2004, Mukherjee requested that Brisbois withdraw from the case. A hearing was held before District Judge Paul Gadola on December 28, 2004. Attorney Brisbois was allowed to withdraw at that time because Mukherjee had retained substitute counsel, attorneys R. Vincent Green and Robert S. Hackett.[6]

A first superseding indictment was returned against Mukherjee on December 29, 2004, the day after Brisbois was allowed to withdraw. As with the original indictment, the first superseding indictment charged Mukherjee with one count of conspiracy to illegally distribute controlled substances and 53 counts of illegal distribution of controlled substances. Mukherjee's new counsel, Green and Hackett, represented him jointly during his arraignment on the first superseding indictment, July 19, 2011 Hr'g Tr. 13, and from that point through the end of trial. *Id.* at 23–24.

Green testified that in May 2005, he and Hackett received a letter from AUSA Jones discussing a possible second Rule 11 Agreement for Mukherjee's consideration. The letter indicated that if Mukherjee accepted an agreement, his sentencing guideline range would be "87 to 108 months." Pet'r's Reply Ex. 8, at 1. From that point through August of 2005, Green and Hackett "negotiat[ed] the plea agreement with Assistant U.S. Attorney Jones." July 19, 2011 Hr'g Tr. 28. On August 26, 2005, AUSA Jones extended a second Rule 11 Agreement. This proposed agreement included a sentencing guideline range of "70 to 87 months." Pet'r's Reply Ex. 9, at 25.

Green testified that in every criminal case, it is his uniform practice to discuss plea agreements with his clients "in detail." *Id.* Green testified that he would have discussed with

---

[6] Although Brisbois was allowed to withdraw as of the December 28, 2004 hearing, a stipulation for substitution of counsel was not entered on the Court's docket until January 5, 2005.

Mukherjee "the possible sentence that he might receive if he were to reject the plea agreement."

July 19, 2011 Hr'g Tr. 29. Green continued:

> Q: And did that include the maximum possible sentence that he could receive under the law?
>
> A: That is correct, yes.
>
> Q: And in this case, that would be several hundred years. Would that be fair to say?
>
> A: That would be fair to say, yes.
>
> Q: And that fact was discussed with your client?
>
> A: I'm sure it was.

*Id*. Green concluded that despite their discussions, Mukherjee rejected the government plea offer against his advice. *Id*.

Robert Hackett also testified concerning his representation of Mukherjee. According to Hackett, he was not aware "Mukherjee was facing sentencing guidelines of three hundred sixty months to life" until after the trial had begun. *Id*. at 44–45. Before the beginning of that trial, Hackett wrote Mukherjee a letter encouraging him to accept the second plea deal. Hackett wrote,

> I would advise you to reconsider your position and seriously consider accepting this deal. There is no way the government will offer you a deal to anything close to the 27 months incarceration to which you have indicated a willingness to accept. . . . Think about it! An additional 27 months is a lot better than a possible 20years. If it is your decision to go to trial, then so-be-it, we will be ready and we will fight to the last breath. But I watch clients go to prison on a daily basis, which is the least favorite part of my job, and my job is to give the best, most sound, advice I can given the facts and circumstances of each case and my advice to you is to accept this deal because it is reasonable and would allow you some certainty in a system that is wholly uncertain.

Pet'r's Mot. Ex. 1, ECF No. 160. Despite Hackett's advice, Mukherjee rejected the plea agreement, preferring to take his chances at trial.

It was a decision Mukherjee would come to regret. During trial, Mukherjee elected to furnish his testimony to the jury. Mukherjee testified that his goal "was to give health care to every American regardless of their wealth." Trial Tr. Vol. X, at 4. He also testified that he did not prescribe medicine until he had obtained a "detailed history" of each patient. *Id*. at 7. Directly contradicting Guerrero's testimony, he claimed that he performed a "brief focus physical" on Guerrero when they were alone in his exam room. Specifically, he claimed he asked Guerrero to squeeze his fingers with her hand to test her strength before he prescribed medication to relieve her pain. *Id*. at 64–68. (After assessing Guerrero's level of pain, Mukherjee also prescribed Codeine cough syrup, pills to combat insomnia, Zoloft for depression and anxiety, and Zyprexa for schizophrenia and bipolar disorder.) Mukherjee testified as follows concerning his medical practice: "In my heart I know that there was no criminal activity at all whatsoever." Trial Tr. Vol. XI, at 100, ECF No. 91.

The jury disagreed, and convicted Mukherjee on 44 of the 54 charges. Mukherjee was sentenced by Judge Gadola after a sentencing hearing that was conducted over three days: July 5, July 7, and October 23, 2006.[7] During the October 2006 hearing, after both parties' counsel and Mukherjee himself offered statements, the Judge summarized the events leading to Mukherjee's sentencing: "the jury returned a verdict after a somewhat lengthy trial in this matter and that verdict found Dr. Mukherjee to be guilty on 44 counts, not guilty on ten counts." Oct. 23, 2006 Sent. Hr'g Tr. 15, ECF No. 141. The court continued:

> So there are 12 counts on which there were convictions of a Class C felony for illegal distribution of Schedule II drugs. There were 14 counts of conviction on illegal distribution of Schedule III drugs. And then there were 18 convictions or a conviction on illegal distribution of – of Schedule V drugs. Forty-four counts of conviction in all.

---

[7] Various arguments were raised concerning Mukherjee's sentencing guideline range which were addressed before the October 2006 date.

*Id*. at 16–17.  The court noted the first 12 counts each carry a penalty of 20 years' imprisonment, the next 14 counts each carry a penalty of five years' imprisonment, and the final 18 counts each carry a penalty of up to one year in prison.  *Id*. at 15–16.

The court then determined that, based on the evidence, the advisory guidelines range were "an appropriate penalty in this matter" despite the fact they were not mandatory.  *Id*. at 17.

> The evidence demonstrates a number of practices uncommon to the legitimate practice of medicine occurring in defendant's office.  Patients paying only cash for medical services, long lines and jockeying for a better position to see the defendant, multiple patients being brought into the doctor's office for examination at one time.  The unusual state of defendant's office with files on the examination table.  And defendant with his feet upon the desk.  The drug use in the office's bathroom.  Defendant's practice of regularly keeping the office open until 1:00 or 2:00 a.m. in the morning.  Drug addicts coming from out of state even to get prescriptions filled at local pharmacies refusing to honor defendant's prescriptions.

*Id*. at 24.  The court concluded that "defendant wrote many more prescriptions without a legitimate medical purpose than the 44 prescriptions in his counts of conviction," and that "defendant's medical office was effectively a prescription mill with addicts coming from out of state even to get prescriptions, eventually making local pharmacies suspicious of defendant's practice."  *Id*. at 25.

The court also addressed the government's motion for a two-level enhancement based on obstruction of justice.  After trial, the government moved for a two-level enhancement pursuant to U.S. Sentencing Guideline Manual § 3C1.1 for obstruction of justice based on perjury, noting the discrepancy between Guerrero's and Mukherjee's trial testimony.  In addressing the motion, the court established the following:

> Based on the Court's observation of the witnesses, their demeanor and their candor with the Court, the Court finds Detective Guerrero's testimony to be credible and that the defendant did not perform a physical examination on Guerrero before issuing a prescription.  Consequently the Court finds that a preponderance of the evidence indicates that defendant willfully failed to tell the

truth on the witness stand thereby obstructing or impeding the administration of justice.

*Id.* at 30–31. After overruling Mukherjee's other objections to the Presentence Investigation Report, the court sentenced him. "Accordingly, the Court hereby commits the defendant to the custody of the United States Bureau of Prisons to be imprisoned for a term the remainder of his life."[8] *Id.* at 34.

The Sixth Circuit affirmed Mukherjee's conviction and sentence, *see United States v. Mukherjee*, 289 F. App'x 107 (6th Cir. 2008), and the Supreme Court declined to issue a certificate of certiorari. Mukherjee then filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255, arguing that he was "deprived of his constitutional right to the effective assistance of counsel and due process right to a fair trial or hearing at four stages of the case, during plea negotiations, at trial, at sentencing, and in his appeal of right." Pet'r's Mot. 2, ECF No. 160.

On May 17, 2010, the motion was referred from this Court to Judge Binder for recommendation. After receiving a number of supplemental briefs concerning various issues, and conducting two evidentiary hearings, Judge Binder issued a report and recommendation on October 11, 2011. Judge Binder suggested that Mukherjee's motion be granted in part, concluding that his Sixth Amendment right to effective counsel during plea negotiations had been violated when Attorney Hackett advised him "the maximum penalty he could face if he went to trial and lost was twenty years' imprisonment." Report & Recommendation 11, ECF No. 193. To remedy this constitutional violation, Judge Binder recommended that Mukherjee

---

[8] In order to reach the desired sentencing range, Mukherjee received the following sentences, all to run consecutively: 20 years on each of the 12 Class C felonies (240 years); 5 years on each of the 14 Class B felonies (70 years); and one year on each of the 18 Class A misdemeanors (18 years). All told, Mukherjee was sentenced to 328 years in prison.

"be resentence[ed] according to the plea offer rejected, i.e., a sentence within the range of 70 to 87 months." *Id.* at 20.

Judge Binder further recommended that Mukherjee's other arguments — that he was denied effective assistance of counsel at trial, during sentencing, and upon appeal — are without merit and should be denied. *Id.*

Both parties were given until November 15, 2011 to file objections to the Judge's report and recommendation. The government objected to the portion recommending that Mukherjee's right to effective counsel had been denied during plea negotiations. Mukherjee did not file any objections. The case was erroneously assigned to Judge Mark A. Goldsmith, and remained on his docket until it was reassigned to this Court on October 18, 2012.

## II

The filing of an objection to a magistrate judge's report and recommendation requires the district court to "determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). The district judge may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.* The failure to file objections to a report and recommendation, however, "constitutes a waiver of any further right of appeal," *Varner v. Wolfenbarger*, No. 08-11162, 2010 WL 3290959, at *1 (E.D. Mich. Aug. 19, 2010), and relieves the district court from its duty to independently review the record. *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *see also Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991) ("A district judge should not have to guess what arguments an objecting party depends on when reviewing a magistrate's report.") (quoting *Lockert v. Faulkner*, 843 F.2d 1015, 1019 (7th Cir. 1988)).

## III

The government has objected to the portion of Judge Binder's report recommending Mukherjee's motion to vacate be granted, and accordingly, this Court will review that determination *de novo*. *See* Fed. R. Civ. P. 72(b)(3); *Flournoy v. Marshall*, 842 F.2d 875, 878 (6th Cir. 1988) (establishing that review of a magistrate judge's report is to be *de novo* unless the parties consent to the more deferential "clearly erroneous" standard). Upon review, Mukherjee's Sixth Amendment right to effective counsel was not violated during plea negotiations, and Judge Binder's report will be rejected on this point.

The analytical starting point concerning Mukherjee's ineffective-assistance claim begins with the familiar standard announced by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the first inquiry is whether counsel's representation "fell below an objective standard of reasonableness." *Id*. at 687–88. The next question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. Accordingly, to establish an ineffective assistance of counsel claim, the complaining party must satisfy a two-part test: a showing that counsel's performance was constitutionally deficient, and that the defendant was prejudiced as a result. *Id*. at 687.

*Strickland*'s test to determine ineffective assistance was applied to the context of plea negotiations in *Hill v. Lockhart*, 474 U.S. 52 (1985). Effective performance in this context requires "counsel's informed opinion as to what pleas should be entered." *United States v. Angelos*, 417 F. App'x 786, 790 (10th Cir. 2011) (quoting *United States v. Carter*, 130 F.3d 1432, 1442 (10th Cir. 1997)); *see also United States v. Morris*, 470 F.3d 596, 602 (6th Cir. 2006) (applying *Strickland* test to plea offers, "requiring that a defense attorney inform her client of plea offers and the potential penalties"). The prejudice component "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process."

*Hill*, 474 U.S. at 59.  Where, as here, a petitioner chose to reject a plea offer, he must show "a reasonable probability that he would have pleaded guilty had he received proper advice." *Morris*, 470 F.3d at 602 (quoting *Griffin v. United States*, 330 F.3d 733, 738 (6th Cir. 2003)).

In 2012, the Supreme Court addressed the specific issue implicated here — a claim for ineffective assistance of counsel where the petitioner rejected a plea agreement based on counsel's advice.  *Lafler v. Cooper*, 132 S. Ct. 1376 (2012).  The Court confirmed that the *Strickland* test is the appropriate standard for assessing such claims.  *Id*. at 1390.  The Court then discussed the appropriate remedy when counsel's representation is determined to be deficient: "The correct remedy in these circumstances, however, is to . . . reoffer the plea agreement."  *Id*. at 1391.  The Court concluded that it was then the lower court's discretion to determine whether to "vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed."  *Id*.

In this case, however, there is no need to reach the question of remedy, as Mukherjee can satisfy neither of *Strickland*'s two requirements.

**1**

When evaluating counsel's performance under *Strickland*, courts are to apply a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690; *see also Pough v. United States*, 442 F.3d 959, 966 (6th Cir. 2006) (cautioning that courts should not "indulge in hindsight, but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors").  "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."  *Harrington v. Richter*, 131 S. Ct.

770, 788 (2011). A defendant challenging his attorney's conduct during plea bargaining therefore bears "a heavy burden," *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005), and "must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence." *Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006) (quoting *United States v. Cieslowski*, 410 F.3d 353, 358 (7th Cir. 2005)).

Mukherjee's first attorney, William Brisbois, informed him that if he rejected the government's plea offer and went to trial, he would be facing "[h]undreds of years" in prison. July 19, 2011 Hr'g Tr. 10. Brisbois attempted to persuade Mukherjee to accept the plea offer, *id.* at 19, but was unsuccessful. Mukherjee rejected his advice. *Id.* at 10.

R. Vincent Green, Mukherjee's second attorney (and joint-counsel with Robert Hackett), warned Mukherjee about rejecting the government's second plea offer. Green testified he was "sure" he discussed with Mukherjee the maximum possible sentence, which "would be several hundred years." *Id.* at 29. Despite Green's advice to Mukherjee that he accept the plea, "[h]e rejected it." *Id.* Neither Brisbois's nor Green's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. In fact, both attorneys performed just as the Sixth Circuit demands: they informed Mukherjee of the government's plea offers and the corresponding potential penalties, and delivered informed opinions as to what pleas should be entered.

Mukherjee's remaining counsel, Robert Hackett, represented him along with Attorney Green. Hackett wrote Mukherjee a letter, wherein he implored, "Think about it! An additional 27 months is a lot better than a possible 20years." Pet'r's Mot. Ex. 1. Mukherjee relies on this one line in this one letter to suggest that he believed the maximum sentence he could face was

twenty years. At the July 19, 2011 hearing, his direct-examination testimony was consistent with this claim:

> Q:     So in connection with this final plea offer, was it your understanding that the maximum sentence you were facing if you lost at trial was twenty years?
>
> A:     That was my understanding . . . .

July 19, 2011 Hr'g Tr. 60. Mukherjee emphasized that if he had known a longer sentence was possible, he would have accepted the plea offer "[w]ithout any question." *Id*. at 61.

On cross-examination Mukherjee contradicted his testimony from only moments before. Mukherjee testified as follows:

> Q:     Dr. Mukherjee, I believe you said that during your discussions with Mr. Brisbois, Mr. Brisbois told you you were looking at a sentence – if you didn't take the guilty plea, you were looking at no less than seventeen, no more than twenty-four years. Is that correct?
>
> A:     That was my understanding, sir. Please excuse me. He also might have said that the max' would be thirty years.
>
> Q:     Excuse me, Doctor.
>
> A:     I'm sorry.
>
> Q:     That was your understanding?
>
> A:     That was my understanding. He said the median would be around twenty years.
>
> Q:     So you knew at that time, at least, you could get more than twenty years?
>
> A:     Yeah.

*Id*. at 61–62. The fact that a superseding indictment followed Brisbois's representation did not diminish the potential sentence in Mukherjee's mind, as he testified that he "knew that the First Superseding Indictment increased the government's claim as to the severity of [his] crime." *Id*. at 63.

Hackett's advice in the letter, however, does not demonstrate inadequate legal advice, particularly in light of the strong presumption that Hackett "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. In fact, considered in the proper context, Hackett's letter was entirely reasonable.

That Mukherjee could have faced twenty years if convicted at trial is certainly not in dispute. Hackett testified that he never intended his reference to "a possible twenty years" to represent Mukherjee's maximum exposure. Asked what he meant, Hackett explained as follows:

> A:    I think that was based upon my – based upon my discussions with Mr. Jones, based upon the amounts that we were talking about, I believe, the guideline calculations with regard to those amounts, and I believe the guidelines were like nineteen years – were like nineteen years three months to twenty-two-seven or something like that, so, I mean, I think I just kind of threw twenty years, you know, just kind of a middle – a middle floor with regard to the guideline range.
>
> \*        \*        \*        \*        \*
>
> Q:    I understand, but the reference to twenty years refers to the likely sentence that Dr. Mukherjee would receive if he were convicted at trial rather than the maximum possible sentence?
>
> A:    I think that would be true.

July 19, 2011 Hr'g Tr. 47–48.

Further, at the time Hackett wrote the letter, September 2005, the government had yet to elevate its allegations as to the quantity of drugs Mukherjee illegally prescribed (this amount was recalculated on January 3, 2006 — *see* Pl.'s Resp. Mot. in Limine Ex. 5, ECF No. 69). Accordingly, the increased drug quantity, along with Mukherjee's refusal to accept responsibility and his perjury at trial, were not considerations for Hackett when he estimated Mukherjee could face twenty years if convicted at trial. And as he explained, the sentencing estimate was not a representation of Mukherjee's maximum exposure, but rather a benchmark for assessing the

government's offer, which Hackett "very strongly" urged Mukherjee to accept. July 19, 2011 Hr'g Tr. 49. This was not deficient representation — it was an attorney trying to get his client to consider his options logically based on the information available at the time. As explained in *Jones v. United States*, 178 F.3d 790 (6th Cir. 1999),

> The district court found that Massey's performance in advising Jones of the risks involved with a trial as opposed to accepting the plea offer did not fall below an objective standard of reasonableness. We agree with this conclusion. The facts suggest that Massey adequately advised Jones with respect to the plea offer and the potential sentence that he would receive based on the information that Jones gave him. . . . Though Massey probably could have been more explicit in his advice to Jones, the record does not suggest that his performance was deficient.

*Id.* at 794. Similar logic governs here. While Hackett could have been more explicit that the twenty years he was referring to was not Mukherjee's maximum exposure, but a reasonable estimate of a likely sentence, the lack of precise specificity does not render his representation deficient. *See United States v. McConer*, 530 F.3d 484, 494 (6th Cir. 2008) (attorney's representation was deemed effective counsel even though he did not inform his client of potential maximum exposure and instead only warned that the case would "be referred to the federal government" if the client did not plead guilty).

In his report and recommendation, Judge Binder concludes that Hackett advised Mukherjee, "both orally and in writing, that the maximum penalty he could face if he went to trial and lost was twenty years' imprisonment." Report & Recommendation 11. "Therefore, with respect to the final decision of whether to accept a plea offer or proceed to trial, the evidence shows that Petitioner was incorrectly advised that he could face a maximum of 20 years rather than the 328 year sentence he did receive." *Id.*

Judge Binder's finding of fact are subject to a *de novo* review. *See United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999) (affirming district court's *de novo* review of "the magistrate judge's findings of fact and conclusions of law"). A *de novo* review of the evidence

does not support his conclusions. Hackett did not advise Mukherjee his maximum exposure was twenty years, and in fact, Mukherjee did not believe his maximum exposure was twenty years (as he testified, he understood he could be facing thirty). Rather, Hackett's reference to a possible twenty years was a reasonable estimate of what Mukherjee's sentence could be if convicted at trial based on the information known at the time, not a flawed prediction of the potential maximum penalty. That estimate — a sentence exceeding hundreds of years — was communicated to Mukherjee by both Attorneys Brisbois and Green. Further, Hackett's letter may not constitute ineffective assistance even if he had indicated twenty years was the maximum sentence possible. *See Porter v. Lockhart*, 925 F.2d 1107, 1110 (8th Cir. 1991) ("Mere proof that an attorney misstated the law on one isolated occasion will not suffice to make out a claim of ineffective assistance, particularly where, as here, the defendant is represented by more than one attorney.").

**2**

Even if Hackett's letter satisfied the first element of a claim for ineffective assistance of counsel, Mukherjee has not presented compelling evidence he would have otherwise accepted the plea offer. Noted by the Sixth Circuit in *Morris*, and outlined above, to satisfy the second element of a claim for ineffective assistance of counsel, Mukherjee must demonstrate "a reasonable probability that he would have pleaded guilty had he received proper advice." *Morris*, 470 F.3d at 602 (quoting *Griffin*, 330 F.3d at 738).

During plea negotiations, Mukherjee was between 62 and 63 years old. He knew that, if convicted at trial, he could receive up to thirty years in prison. Nevertheless, Mukherjee rejected a government plea offer of 70 to 87 months (between 6 and just over 7 years). In fact, he consistently rejected the advice of all of his attorneys — Brisbois, Green, and Hackett — who recommended he accept government plea offers. He was willing to risk a sentence that would

place him in prison until he was 93 years old when the government offered an agreement that would have called for his release around his 70th birthday.

Judge Binder's report, however, "suggest[s] that [Mukherjee] has shown a reasonable probability that he would have pleaded guilty given competent advice." Report & Recommendation 12. To support this conclusion, Judge Binder emphasizes that Mukherjee testified he would have taken the plea offer "[w]ithout any question . . . had he realized that a sentence of hundreds of years was a possibility . . . . While [Mukherjee's] testimony can certainly be seen as self-serving, there is no evidence on this record to contradict it." *Id.*

Respectfully, a *de novo* review of the record is to the contrary. Despite the disparity between the sentence offered and that imposed, which can be "sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer," *Dedvukovic v. Martin*, 36 F. App'x 795, 798 (6th Cir. 2002), the evidence in this case diminishes the impact of that disparity. Mukherjee rejected a seven-year agreement in favor of risking what he understood as the possibility of a thirty-year term. He did this despite the fact he would be incarcerated until at least his 93rd birthday. His testimony, standing alone, that he would have accepted the government's deal "without any question" had he known a life sentence was possible is simply not credible.

This conclusion is especially warranted given Brisbois's and Mukherjee's testimony during the trial and subsequent evidentiary hearings. Brisbois testified on July 19, 2011 that Mukherjee "was having difficulty processing his situation" as they discussed the government's first plea offer. July 19, 2011 Hr'g Tr. 18–19. Brisbois elaborated that he attempted to be as persuasive as possible about accepting the government's offer, but he came away from his discussion with Mukherjee with "the understanding he just isn't getting it, he just isn't

understanding, because in my opinion he really didn't have a choice, so in that sense, he was either in total denial or wasn't understanding his options." *Id*. at 19. Mukherjee confirmed that it was not a lack of understanding concerning his situation, but a refusal to accept it, when he testified at trial that "in [his] heart," he did not believe he had done anything wrong. Trial Tr. Vol. XI, at 100. In short, Mukherjee was not going to accept any plea offers, regardless of whether he believed he could face a sentence that left him in prison for life.

Mukherjee cannot satisfy either requirement of the *Strickland* test for ineffective-assistance-of-counsel claims. The portion of Judge Binder's report suggesting the opposite will be rejected, and the government's objection will be sustained. As no other objections have been lodged, the remainder of the Judge's report (denying each of Mukherjee's other arguments to support his motion) will be adopted.

## IV

Accordingly, it is **ORDERED** that the government's objection to the Judge Binder's report and recommendation, ECF No. 197, is **SUSTAINED**. The portion of the Judge's report suggesting that Petitioner Mukherjee's motion to vacate be granted will be **REJECTED**.

It is further **ORDERED** that the remainder of the Judge Bidner's report and recommendation, ECF No. 193, is **ADOPTED**.

It is further **ORDERED** that Petitioner Mukherjee's motion to vacate his sentence, ECF No. 160, is **DENIED**.

It is further **ORDERED** that Petitioner Mukherjee's motion for bond, ECF No. 205, is **DENIED** as moot.

Dated: April 29, 2013                                       s/Thomas L. Ludington
                                                            THOMAS L. LUDINGTON
                                                            United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 29, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS